25 C.C.P.A. (Patents)

## PELZER v. WEAVER.

### Patent Appeal No. 3979.

Court of Customs and Patent Appeals.

June 6, 1938.

Pennie, Davis, Marvin & Edmonds, of New York City (Daniel V. Mahoney and Louis D. Forward, both of New York City, Clarence M. Fisher, of Washington, D. C., and Raymond F. Adams, of New York City, of counsel), for appellant.

Thomas E. Scofield, of Kansas City, Mo. (H. L. Shenier, of Kansas City, Mo., of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal in an interference proceeding from the decision of the Board of Appeals of the United States Patent Office affirming the decision of the Examiner of Interferences awarding priority of invention of the subject matter defined in the single count in issue to Joseph B. Weaver, appellee.

The invention relates to a process of heating oil by means of furnace gases, as set forth in the count in issue which reads as follows: "A method of heating oil which comprises establishing a stream of furnace gases in heat exchange with surfaces in contact with said oil, removing the furnace gases from contact with said surfaces and recirculating withdrawn furance gases to a plurality of places along said stream to modify the temperature of said stream at a plurality of separated points relative to its passage in contact with said surfaces."

The interference is between appellant's application No. 441,649, filed April 4, 1930, and appellee's patent No. 1,936,699, issued November 28, 1933 on an application, No. 142,420, filed October 18, 1926.

The count in issue originated in the Weaver patent.

Appellant is the junior party, and the burden was upon him to establish priority of invention by a preponderance of the evidence.

Appellee submitted no testimony, and is, therefore, restricted to his filing date, October 18, 1926, for conception and constructive reduction to practice.

Appellant submitted considerable evidence for the purpose of establishing that he conceived and reduced the invention to practice prior to appellee's filing date.

It is conceded by counsel for appellee that appellant "took testimony and showed that an operation was practiced at a pilot plant in East Chicago, and in the Houston refinery stills Nos. 141 and 142. The subject-matter of this operation is shown in Pelzer's application, Serial No. 198,621, filed June 13, 1927, and if this operation reads upon the count of the interference, then priority of the subject-matter should be awarded to Pelzer, since this operation appears to have been practiced at least as early as June, 1926"; and that the process practiced by appellant as early as June 1926 is fully disclosed in Fig. 1–B of his application No. 198,621, filed June 13, 1927. (That application is not in this interference, and is referred to only because Fig. 1–B therein discloses the process practiced by appellant in 1926).

The sole issue in the case is whether the process practiced by appellant as early as June, 1926, and which is disclosed in Fig. 1–B conforms to the invention defined in the appealed count. If it does, appellant is entitled to an award of priority and the decision of the Board of Appeals should be reversed. If it does not, appellee is entitled to an award of priority and the decision of the Board of Appeals should be affirmed. The determination of that issue requires an interpretation of the language of the involved count.

It is well settled that generally counts in an interference should be given the broadest interpretation their language will reasonably permit. However, expressly defined limitations can not be ignored, and, in the event the language of the counts is susceptible of more than one construction, the meaning to be given it must be that disclosed in the application or patent in which the counts originated. Ernest M. Brogden v. Henry B. Slater, 40 F.2d 988, 17 C.C.P.A., Patents, 1240; In re Alexander M. Nicolson, 49 F.2d 961, 18 C.C.P.A. Patents, 1468; Neumair v. Malocsay, 77 F.2d 622, 22 C.C.P.A., Patents, 1349; Hausman v. Hochman, 83 F.2d 703, 23 C.C.P.A., Patents, 1162.

Appellee's apparatus and process are clearly disclosed in his patent drawings, which, for the purpose of clarity, we reproduce.

Fig. 1

Appellee's process and apparatus are described in his patent as follows:

"Describing in detail the particular embodiment illustrated in the drawing, 1 represents diagrammatically a convertor, which may be one of many types suitable for treating hydrocarbon oils in the vapor phase. In this convertor, 2 designates the combustion chamber and 3 the heating elements through which the products of combustion from the combustion chamber 2 pass.

\* · \* \* \* \* \*

"4 represents a suitable preheater or vaporizer in which the products of combustion from the combustion chamber 5 pass through the heating element 6. The preheated oil is then vaporized and subjected to the converting action in the convertor 1 by any suitable piping arrangement and the excess products of combustion pass through the flue 7 to the stack 8.

\* \* \* \* \* \*

"Referring again to the diagrammatic drawing, it is to be noted that the convertor 1 at its outlet end in place of being connected to a stack, is connected by a flue 9 to the combustion chamber of the preheater or vaporizer, and a suitable fan or other draft means 10 is located in the flue 7 so that any desired velocity through the convertor and the preheater can be maintained. The flue 7 not only has a connection to the stack 8, but it also has a connection to a return flue 11 for recirculating the waste gases or products of combustion. The amount of waste gases that go to the stack 8 or to the return flue 11 can be governed by the dampers 12 and 12'. Also the waste gases which pass through the return flue 11 can be divided between the convertor 1 and the vaporizer 4 by means of the dampers 13 and 13' located in the passages 14 and 14' respectively."

It will be observed that appellee's patent discloses a single stream of heating gases which passes through the combustion chamber 2, over the heating coil 3, through the flue 9, into the combustion chamber 5 and over the heating coil 6 where it is removed at 7, recirculated for tempering purposes by the blower 10 through flue 11 and passages 14 and 14' into the combustion chambers 2 and 5.

Fig. 1–B of appellant's application No. 198,621, which discloses the process successfully performed by appellant in 1926, is herewith reproduced.

Fig. IB.

In describing the process carried out by means of his structure, appellant stated in his application No. 198,621 that:

"The heating conduit 1 may comprise a tube or a bank of tubes through which the stock passes but once. This heating conduit is arranged in a furnace structure comprising a firebox 20, a heating flue 2 and an uptake flue 3 connecting the firebox with the upper end of the heating flue 2. *Branch flue 4 communicating with the upper end of the uptake flue 3 is arranged for conducting heating gases from the uptake flue to the heating flues, 13, 14, 15 and 16 in which the drums 5, 6, 7 and 8 are arranged.* Heating gases escape from the heating flues 13, 14, 15 and 16 through the heating flue 2. The flow of heating gases through the heating flues 13, 14, 15 and 16 may be concurrent with the flow of oil vapors through the drums 5, 6, 7 and 8, as in the apparatus illustrated in Fig. 1A, or may be countercurrent, as in the apparatus illustrated in Fig. 1B.

\* \* \* \* \* \*

"A circulating fan 21 is arranged for withdrawing heating gases from the lower end of the heating flue 2 and from the heating flues surrounding the drums 5, 6, 7 and 8 through flue 19 and for supplying these relatively cool heating gases to the main 22. Branch flues 23, 24 and 25 are arranged to permit discharge from the main 22 into the firebox 20 through suitably arranged openings of part of the relatively cool heating gases for tempering the hot products of combustion from the firebox before the mixture of heating gases contacts with surfaces through which heat is transferred to oil or oil vapors and for protecting the refractory linings of the firebox and the uptake flue. *Branch flue 26 is arranged to permit discharge from the main 22 into the flue 4 of part of the relatively cool heating gases discharged by fan 21 for tempering or further tempering the heating gases supplied to the heating flues 13, 14, 15 and 16 in which the drums 5, 6, 7 and 8 are arranged.* Heating gases not discharged through flues 23, 24, 25 and 26 are discharged through the heat exchanges 27, which may be arranged in a stack 28, for preheating air supplied to the firebox 20 for combustion of fuel therein." (Italics ours.)

It further appears from Fig. 1–B that the gases in the uptake flue 3 are divided; one stream, as hereinbefore noted, pass-

ing through branch flue 4, and the other stream passing from the uptake flue 3 downwardly through heating flue 2, over the heating conduit 1, into the bottom of flue 2 where it unites with a stream of gases coming from flue 19. The combined gases are then withdrawn by fan 21, and passed into main 22. Some of the recirculated gases pass from main 22 through flue 26 into branch flue 4 and temper the gases which pass through flues 13, 14, 15, and 16 to heat the oil in drums 5, 6, 7, and 8, and some pass through flues 23, 24, and 25 into the firebox 20 and temper the hot gases therein. The recirculated gases which do not pass from the main 22 through flues 23, 24, 25, and 26 are discharged into the heat exchange 27.

It is clear from what has been said regarding appellant's drawing, Fig. 1–B, that appellant contemplated a system comprising *two streams* of gases; one passing through branch flue 4 into flues 13, 14, 15, and 16 to heat the oil in drums 5, 6, 7, and 8, and the other passing from the uptake flue 3 through flue 2 to heat the oil in the conduit 1. Appellant further contemplated that the gases from the two streams should be brought together in the bottom of flue 2 and recirculated by means of the fan 21 into the main 22, and through the flues 23, 24, 25, and 26 for the purpose of tempering the gases in firebox 20 and also those passing through branch flue 4.

It is true that some of the gases in the stream passing through the flue 2 over the conduit 1 might pass through the flue 26 into the branch flue 4, and that a part of the gases from the second stream supplied by the branch flue 4 to the heating flues 13, 14, 15, and 16 might pass through the flues 23, 24, and 25 into the firebox 20. In each instance, however, those gases are recirculated for tempering purposes.

The tribunals of the Patent Office concurred in holding that, as the count originated in appellee's patent and as the patent describes a single-stream process (a single stream of heating gases passing over both heating coils 3 and 6, some of which are recirculated through the flue 11 and passages 14 and 14' into fireboxes 5 and 2, respectively), the count should be construed in the light of appellee's disclosure, and should not be construed so as to cover appellant's two-stream process, disclosed in Fig. 1–B

At the time of the oral arguments in this court, counsel for appellant frankly conceded that if it was proper to construe the count as being limited to a single stream of furnace gases, the count would not read on the process conceived and reduced to practice by appellant in 1926.

The Board of Appeals stated in its decision that it appeared from appellant's Fig. 1–B and from the testimony in the case that appellant's process practiced by him as early as June, 1926, involved "two separate parallel main streams of gas," and that:

"When two separate streams of gas are established, each stream merely contacts with one oil heating surface. The count requires 'establishing *a* stream of furnace gases in heat exchange with *surfaces* in contact with said oil.' From what has been stated, it is our view that this step in the count does not read on the operation of the Houston or the East Chicago plant." (Italics quoted.)

"As we do not find the first step of the count present in the operation of these plants, we also therefore do not find the last step disclosed. The gases withdrawn by the fan 21 are diverted *to both of the streams established and are not recirculated to a plurality of places along a single stream.*

\* \* \* \* \* \*

"The diversion of some of the gases through the passage 26 is merely an auxiliary feature for the purpose of tempering the gases in one of the main streams in conduit 4. To seize upon this auxiliary feature and hold that a single stream is established through this passage is apparently improper in view of the testimony and the description in application No. 198,-621, referred to above." (Italics ours.)

Counsel for appellant insist that the language of the count, "a stream of furnace gases in heat exchange with surfaces in contact with said oil," should be interpreted so as to cover appellant's two-stream process; whereas, it is argued by counsel for appellee, and each of the tribunals of the Patent Office held, that that language should be interpreted as covering a single-stream process only, such as is contemplated by the disclosure in appellee's patent; that is, the language should be interpreted as though it read "a single stream of furnace gases in heat exchange with surfaces in contact with said oil."

It will be observed that the count defines a process in which "*a stream*" of furnace gases is established in heat exchange "with surfaces in contact with said oil," and that the withdrawn furnace gases (withdrawn by means of a fan or blower) are recirculated "to a plurality of places along *said stream* to modify the temperature of *said stream* at a plurality of separated points relative *to its* passage in contact with said surfaces." (Italics ours.)

Giving the count the broadest construction its language will reasonably permit, we think it clearly contemplates but *a single stream of furnace gases* in heat exchange relation *with more than one heating surface,* and the recirculation of withdrawn furnace gases to a plurality of places along *such single stream* to modify the temperature of *such stream* at a plurality of separated points relative to *its passage.* However, if the language of the count is capable of any other construction, it should be considered in the light of the disclosure in appellee's patent where it originated, and, when so considered, it can have no meaning other than that which we have given it.

As we have construed the count, it is obvious that it does not read on the process disclosed in Fig. 1–B, conceived and reduced to practice by appellant prior to appellee's filing date.

In view of the fact that it is agreed that appellant's Fig. 1–B fully and accurately discloses the process conceived and reduced to practice by him prior to appellee's filing date, we deem it unnecessary to discuss the testimony submitted by appellant on that subject.

Counsel for appellant argue that if the count in issue does not read upon the disclosure in Fig. 1–B, appellant's involved application does not disclose the invention, and that, therefore, there is no basis in fact for an interference between the involved applications of the parties.

In reply to that contention of counsel, it is sufficient to say that the question of whether appellant is entitled to make the count is not before us; however, we think it proper to observe that the precise structure disclosed in appellant's Fig. 1–B is not disclosed in his involved application.

The decision of the Board of Appeals is affirmed.

Affirmed.